## OCTOBER TERM, 1851.

15 3
115 331
54a 216

15 3
f 152 666

15 3.
153 47

15 3.
173 472

------------------

### HAMILTON AND TREAT, JUDGES, vs. ST. LOUIS COUNTY COURT.

1. The act to increase the salaries of the judges in St. Louis county, of March 3, 1851, does not leave the additional amount of compensation, to be paid to the judges, to the discretion of the county court.

2. There is no power in the judiciary to remedy injustice and oppression in a legislative act, except, where in the attempted injustice or oppression, some constitutional provision is violated.

3. The fact that the representatives of a county sanctioned a local act applicable to it, cannot affect its constitutionality.

4. If there be in the constitution, any language of doubtful import, the circumstances and condition of the people, and the history of the instrument itself, must, of course, be examined, to find the meaning of the clause in question; but where the language is plain and intelligent, and consistent with all other parts of the instrument, there is no authority, by reference to facts out of the instrument, for interpolating either a grant of power, or a restriction upon powers granted.

5. The 19th section of the declaration of rights "that all property subject to taxation in this State, shall be taxed in proportion to its value," is mandatory upon the General Assembly, when exercising the taxing power; and furnishes a rule which is not to be departed from. What property shall be subjected to taxation is left to their discretion, but when they have selected the subjects, the rule for assessing the tax, is, in proportion to the value of the property.

6. The act to increase the salaries of the judges in St. Louis county, of March 3, 1851, is not unconstitutional.

Hamilton and Treat, Judges vs. St. Louis County Court.

### PETITION FOR MANDAMUS.

1. The following is an account presented by Alexander Hamilton, judge of the circuit court, to the county of St. Louis for payment.

"The county of St. Louis to Alexander Hamilton, Dr:

For amount of compensation allowed him out of the county treasury of St. Louis county for his services as judge of the 9th judicial circuit, Mo., from the 1st day of August, A. D., 1851, to November 2nd, 1851, pursuant to the act of the General Assembly, entitled 'an act to increase the salaries of judges in St. Louis county,' approved March 3d, 1851. No fees having been collected by him during the period aforesaid, under the former compensation acts, as may appear by the certificates of the clerk of the said court and the sheriff of the said county-    -    -    -    -    -    -    -    -    -    -    $500 00

Received payment."

1. Order of the county court:

STATE OF MISSOURI, } SS.
COUNTY OF ST. LOUIS. }

In the St. Louis County Court, Nov. Term, 1851,
WEDNESDAY, November the 19th, 1851.

"The Honorable Alexander Hamilton presents to the county court for payment, an account against the county of St. Louis for the sum of $500 00, alleged amount of compensation allowed him out of the county treasury for services as judge of the circuit court of St. Louis county from the 1st day of August, 1851, to the 2nd day of November, 1851, pursuant to an act of the General Assembly of the State of Missouri, entitled 'an act to increase the salaries of judges in St. Louis county,' approved March 3d, 1851  Whereupon the court being of the opinion that the act aforesaid is inoperative and void, it is ordered that payment of said account be refused.

### PETITION FOR ALTERNATIVE MANDAMUS.

Alexander Hamilton, judge of the eighth judicial circuit of said State, represents that he has been judge of the said court for the year last past, and to the present time and now is said judge; that by virtue of an act of the General Assembly of the State of Missouri, entitled "an act to increase the salaries of the judges in St Louis county," approved March 3d. 1851, the county court of St. Louis county was authorized and required to pay to him, quarter yearly, a sum sufficient to make his annual salary not less than three thousand dollars; that by virtue of said act there was due to your petitioner on the second day of November, A. D., 1851, the sum of $500 00 from said county, for which he made out his account and demanded said sum from said county court, on the 19th day of said November, and that the said county court refused to pay the same, or any part thereof, as will appear from the copy of said account and the order of said county court, refusing to allow the same, or to order the same to be paid, a certified copy of which proceedings of said county court is hereto annexed.

Whereupon your petitioners pray that a mandamus may issue from this honorable court, directed to said county court, commanding said county court to allow said account and cause the same to be paid, or to show cause why said court has not so done, &c.

The writ of mandamus having issued as above prayed for, the county court made the following answer and return, to-wit:

STATE OF MISSOURI, } SS.
COUNTY OF ST. LOUIS, }

In the St. Louis County Court,
November 21st, 1851.

For answer and return to the writ of mandamus, issued at the instance of Alexander Hamilton, Esq., Judge of the St. Louis circuit court, bearing date the 20th day of November, 1851

Hamilton and Treat, Judges, vs. St. Louis County Court.

and served upon the county court on this day, commanding this court to allow and cause to be paid out of the treasury of St. Louis county, a certain account of the said Alexander Hamilton, rendered to this court against the county of St. Louis for the sum of five hundred dollars, alleged to be due to the said Alexander Hamilton from the county of St. Louis according to an act of the General Assembly of Missouri, approved March 3d, 1851, entitled "An act to increase the salaries of the Judges in St. Louis county," or show cause why said account was not allowed and paid. The court says: "This court refused to cause the said account of the said Alexander Hamilton to be allowed and paid out of the county treasury, and for so doing, assign the following reasons:

1. It is not true (in the opinion of this court) that, by the act of the General Assembly above referred to, this court was authorized and required to pay to the said Alexander Hamilton. quarter yearly, a sum sufficient to make his annual salary three thousand dollars; nor was the sum of five hundred dollars, nor any other determinate sum due to the said Alexander Hamilton by the St. Louis county court by virtue of that act, and the matters suggested in said writ on the 2d day of November, 1851.

2. If the said act be of any force and validity, (which this court denies) it only confers upon this county court, a discretion to increrse the salary of the said Alexander Hamilton. which it has not exercised nor been moved to exercise.

3. But this court is of opinion that the act of Assembly referred to, is of no binding force whatever, but that it is in violation of common right, and of the constitution of the State of Missouri, and therefore inoperative and void.

4. All of which is ordered to be certified to the supreme court of the State of Missouri, now sitting at St. Louis, Missouri.

## APPLICATION FOR PEREMPTORY MANDAMUS.

### SPALDING for Relators.

I. A mandamus is the proper remedy: 3 Mis. Rep., 140, county of Boone vs. Todd; 5 Mis. Rep , 268; St. Louis County Court vs. Ruland.

In the above two cases, an account was presented to the county court for disbursements on account of office rent and for fuel, and the decision was, that it was the appropriate remedy, &c.

II. The act for the payment of the Judges of circuit court, common pleas and criminal court of St. Louis county, passed March 1851, page 281 of acts of last session, leaves no discretion to the county court, when the account is presented by the Judges; they are bound to admit and allow it and order it to be paid. The words are *"authorized* and *required, &c."* Dwarris on Stat., 7 L Lib., p. 736, as to *consequences* of act throwing light or *meaning, &c;* Ibid 790 1, real intent, if certain, "will always prevail over the literal sense of terms," page 693-4; in the exposition of a statute the leading clue to the construction is the intention of the legislator, &c., page 725-6, "no statute shall be interpreted so as to be inconvenient and against reason."

III. The act is constitutional.

1. Our State constitution confers "legislative power" upon the General Assembly, and this comprehends *all* legislative power which can be conferred, with such limitations as are contained in the instrument itself. Now this constitution is the act of the sovereign people, it is their power of attorney to their servants and agents, the government of the State.

There is no restriction upon the power to *form counties*, except one, that is, that no county shall contain less than four hundred square miles; nor upon the power to subdivide the State into convenient *districts* for the purposes of the details of government.

## Hamilton and Treat, Judges, vs. St. Louis County Court.

Nor is there any limitation on the power to tax, except these, to-wit: "That all property subject to taxation in this State, shall be taxed in proportion to its value, and that no tax shall be imposed on lands the property of the United States, nor shall lands belonging to persons residing out of the limits of this State, ever be taxed higher than the lands belonging to persons residing within this State."

Now there being no limit to the powers to subdivide into districts, and to tax, there can be nothing in the construction that prohibits the legislature from imposing on any one of the counties or districts, such boundaries as they choose. It is matter of discretion and policy with the legislature and accordingly they have assessed upon different counties the expenses of administering justice, more or less, as will be seen by the following references: Rev. Code 1845, p. 168, secs. 67 and 68, that fuel, stationery, and other things necessary for courts in this county shall be furnished by sheriff, and the county court shall pay it out of the county treasury: Ibid, p. 178, sec. 16, that judge of probate to be allowed all necessary expenses, &c., to be paid out of county treasury: Ibid, p. 131, secs. 2, 3, 5, 6, 7, 10, county to pay costs in certain criminal cases, where there is conviction and the offender unable to pay, &c.: Ibid 164, sec. 13, judges of county court to be paid out of county treasury.

Acts of 1849, p. 38, sec. 4, provides for the payment of $100 annually to each judge of the supreme court out of the county treasury of St. Louis county: 10 Mis. Rep. 591. It is in the power of the State legislature, unless restrained by some provision in the constitution, to prohibit or restrict the exercise of any trade or business within this State. No such prohibitory clause is contained in the constitution of this State: 12 Mis. Reps. 268; 13 Mis. Rep. 243; tax on lawyers, as a class, not unconstitutional.

2. They have assessed, upon individuals, the expenses, in part, of the administration of justice.

Those that litigate have to pay juries, for a fee is taxed, and is advanced by all that bring suits: 13 Mis. Rep. 243. And more than this, the same persons are taxed to pay the judges' salaries: Rev. Code 1845, page 174, sec. 18. The judge of the court of common pleas of St. Louis is to receive fees, to be taxed in suits, &c.

Acts of 1851 page 206, sec. 24, judge of Platte county common pleas to receive fees as compensation.

Ibid, p. 206, sec. 3, judge of Cape Girardeau court of common pleas receives his compensation in fees.

Now these fees are assessments on individuals, designated by the result of the suits. What right has the State to enact that those unfortunate inviduals shall pay a part of the judeges' salaries?

And our circuit judge, also, receives fees taxed and collected on every execution which makes a part of his compensation: page 80, acts of 1840-1.

3. The inequality is no objection, for there will be inequalities, arithmetically, even in attempting to impose the burdens equally. But there is no clause of the constitution that enjoins equality. And the legislature have power, unless restricted by that instrument. Why can they not say that the expenses of all courts, salaries of judges and all, shall be borne by the county or district in which the court is held?

But we see the inequalities of burdens of government, as they have always been and now are, and have passed unquestioned.

The road laws are an instance; also the public improvements in this city, of paving, of making sewers, &c. In these cases the persons in the immediate vicinity are visited with the burden of making the improvement, or keeping it in repair, which is a public one, and in which the public have an interest.

4. The sovereignty is in the State, the county is a mere portion of it, set apart for local purposes, for the details of government. Each county has to take care of its own poor, build jails, court houses, &c., and thus the burden of government, must, of necessity, be unequal, and this inequality is no argument against the exercise of the power, as the burden cannot be made to bear on each individual with mathematical equality. Whether it is constitutional

or not cannot depend upon a question of more or less. This trust and confidence is reposed in our theory of government, in the legislature, who are presumed not to do injustice, not to impose greater burdens upon one portion of the people than upon another, and should they do so, the remedy is, the ballot-box—an appeal to their sense of justice.

5. The city of St. Louis is incorporated by the State law, and a court created, which en- forces the laws of the State and the ordinances of the city, which are laws, so far as passed in pursuance of the powers conferred upon the city authorities, and the judge of that court, the Recorder, is paid by the city.

IV. These doctrines are not new. The same system is acted upon in every State of the Union. The territory of each State is subdivided for purposes of government and police, into counties or parishes, each of which has a local authority for doing certain acts, and is bound to sustain burdens imposed by the legislative authority.

24 Wend., 65: an act of the legislature, imposing a tax on a local district of New York, is constitutional; at page 69 the court considered the question.

3 Denio, 382, Morris vs. The People, at page 399, Scott, who delivered the prevailing opin- ion in the court of errors, says: "It is doubtless within the authority of the legislature to pro- vide means for the proper administration of the government, and to apportion the burdens as they may deem equitable."

The dissentients dissented, not on the constitutional question but on other grounds: 4 Martin's Rep. (N. J.) 138, (3 Condensed Reports 253,) a law imposing a tax on a particular parish, the object of which was a payment of a debt due by the State, is not unconstitutional, page 142.

1 Humph. 48. In Tennessee the legislature have the right to change the direction of a do- nation to a county, before it has been appropriated, or any right required under it.

4 Ham. 227; 4 Wheat. 659, 694; 13 Man. 197; 15 Wend. 325; 5 Greenl. 342, a statute creating a public corporation for public purposes, as a county, a town, a city, &c., is not a contract pro- tected by the constitution of the United States.

13 Pick. 60, An act of a legislature providing that the expense for building a particular bridge, shall be borne in part by the county in which it is situated, is constitutional, &c.

13 Mo. Rep., 412-13-14-15, city of St. Louis vs Thos. Allen. The act to extend the limits of the city of St. Louis, is constitutional.

2 McCord, 359, 360, Hager, I., says, that between 1775 and 1790, the legislature of South Car- olina was uncontrolled, &c., that is, that their constitution did not limit their powers.

9 Greenl., page 56, the legislature may pass a local law, designed to operate particularly in one District of country. "It is not only the right but the duty of the legislature, so to vary the provisions of the law, as to meet as far as practicable, the peculiar exigencies of every portion of the community."

V. But this act of the Assembly is not so unjust and oppressive as to call for the invocation of the great fundamental guaranties of the constitution, even if there were any on the subject, or if there were not, then to resort to the nature of the social compact for a protection against it. Counties, as has been shown, and as is apparent from their organization and use, are mere agents of the government, created by the legislative authority, for the purpose of dispersing the benefits of government to every locality. The courts of justice are among the chief benefits of govern- ment, and in such a community as the State of Missouri, spread over so large a surface, these tribunals must be numerous and penetrate into every locality. These sit in every county, and their ordinary expenses, such as fuel, stationery, &c., are borne by each county for the courts that sit there. The State pays the salaries of the circuit judges out of the treasury; that is, $1000 a year.

In the county of St. Louis this is deemed insufficient from the mass of business, and this law was passed to remedy that defect, and the whole representation from St. Louis county, it is un- derstood, voted for it.

One side of every suit brought, or nearly so, is supported by a citizen or resident of this coun- ty; and perhaps it is not saying more than truth, that two-thirds or three-fourths of the time of the common pleas and of the circuit courts, is taken up with the litigation of our own citizens.

Hamilton and Treat, Judges, vs. St. Louis County Court.

Then why shall we object to bearing the additional expense? Our business is the reason why the tribunals of justice are so much more expensive here than elsewhere in the State. What is the injustice then, in putting that extra expense upon us? If two-thirds of the business of the judge is to hear our cases, why shall we not pay two-thirds of his salary? The other expenses, of fuel, stationery and other necessaries for the courts, are increased in the same ratio as the business of the court, and no objection on the score of the injustice or constitutionality of assessing it on the county, is made. The State thus pays a thousand dollars for the support of tribunals of justice for each county in its limit. Where a judge can do the business of several counties, he of course attends to it for the thousand dollars; but where, as in St. Louis, one judge cannot do all the business, and where he has twenty times as much as some of the other circuit judges, and he receives three times the salary, the State paying one-third of it, the suitors paying, say one-sixth of it, and the county is called upon to pay half of it, what great injustice is there in it?

And the judges here are, in one sense, county judges: their jurisdiction is confined to the county, and the citizens of the county elect them. But this makes no difference; they are the State's officers and agents, whether appointed by the legislature, or the Governor, or the people living within the locality where their jurisdiction is exercised. It is all done by authority of law; and they are to be paid, whether by the State, out of the general treasury, or out of the treasury of the county or district that benefits by their functions, is in the discretion of the legislature left there by the constitution, which confers on them all legislative authority, which, of course, includes the general sub-division of the State into districts, or counties for purposes of government, with powers in certain matters, to manage their own affairs, and subject to the burden and expense of so doing.

The State pays three times as much to the judges that have jurisdiction in this one county, as if expends on any other circuit for the same purposes; and in every other circuit, there are more counties than one.

The number of circuits by the Code of 1845, was fourteen, and of these are only two containing six counties each, and the rest, omitting St. Louis, containing more than six: awarding to this, while the State pays towards the administration of justice through the State, less than one hundred and sixty-seven dollars for each county annually, it pays for St. Louis county three thousand dollars for the same time.

VI. It may be objected that the legislature, if unrestrained by the constitution, may put the whole burden of supporting the State government, on St. Louis county. What prevents them from passing a law requiring us to pay the salary of the Governor, or the officers of the Assembly, &c? I will answer this by asking another question; what restrains them from taxing the professions that are exercised in St. Louis so high as to drive those that exercise them from the State? There is no restriction on the power of taxing polls or classes or professions, or what prevents the legislature from taxing all the property in the State fifty per cent. on its value, for there is no limit to the quantum of tax? The restriction is, that all property subject to taxation shall be taxed in proportion to its value. In all these cases the only guaranty is, that the legislature is taken from the body of the people for short times; that their interest is in the main, the interest of their constituents; that the laws they enact, are to operate on them and their friends, &c. The government is so framed, with checks and balances, that there is no moral certainty that the legislature will never do certain things; and against these there are no guaranties in the constitution. Respect for public opinion, a sense of justice, fear that some other party or set of men will come into power and retaliate, a regard for the public good and for their own reputation and standing will deter men from doing an oppressive, unjust and tyranical act, under our systems of government, where the legislature is elected only for short periods: 13 Pickering 62, Norwich vs. County Commissioners of Hampshire; 3 Dallas 400; 20 Wend. 381; Cockran vs. Van Sussay; 1 Jones 61 (Pa.) page 70; the court discourse on constitutionality. "Of late years it has been much the fashion to impeach the action of the legislature where it happens not to accord with the party's notion of propriety and abstract rights." Also, Field vs. People, 2 Scamman 95; "no proposition is better settled than that of a State constitution is a limitation upon the powers of the legislature, and that the legislature possesses every power not delegated to some other

department, or expressly denied to it by the constitution." 3 Scamman 130, Sawyer vs. City of Alton; "The constitution of Illinois is not to be regarded as a grant of powers; but rather as a restriction on the powers of the legislature; and it is competent for the legislature to exercise all powers not forbidden by that instrument, nor delegated to the general government, nor prohibited to the State by the constitution of the United States." 1 Breese Reports, Coles vs. County of Madison, at page 120, the court say that "neither the constitution of the United States, nor of this State, contain any prohibition to the exercise of such a power by the legislature, and their power have no limits beyond what are imposed by one or other of these instruments, nor is it necessary they should."

1 Louisiana Rep., page 11, the extreme cases of a bar is not the mode of settling of constitutional questions.

VII. The treasury of the county is made up of funds belonging to the State. It is a part of the State treasury, deposited there for convenience; and as it is all collected by virtue of the laws of the State, so the laws of the State can dispose of it.

The funds belonging to the county treasury are derived from the following sources:

1. From taxes levied by virtue of State laws.

2. From fines imposed by State laws which provide for their payment into the county treasury.

3. From the three per cent. paid once by the United State on the sales of the public lands, which by act of the General Assembly is paid over to the several counties; though this is a special fund.

The legislature have the right to abolish counties, and should they do so, the funds in the county treasury belong to the State. The county treasuries are only branches of the State treasury, located in the neighborhood where the money is to be disbursed.

1 Breese, Cotes vs. County of Madison, page 120, it is said, "But all public incorporations, which are established as a part of the police of the State, are subject to legislative control, and may be changed, modified or enlarged, restrained or repealed, to suit the ever varying exigencies of the State. Counties are corporations of this nature, and are, consequently, subject to legislative control."

1 Mis. Rep., Conner vs. Bent, page 239, the court says that "if the court meant that the legislature could not release a judgment against an individual in favor of a county. we cannot subscribe to it. When a law authorizes county taxes to be levied and collected, and directs a county court what to do therewith, it cannot be said that the money rested irrevocably in the county, but it must be subject to the superior control of the legislature, for the legislature have power over the counties, and all things that belong to them in that capacity, simply as such.'

If the legislature abolish a county, its treasury, that is, its funds, as a county, belong to the State. They should, in justice, be disbursed in the locality taxed to raise them, but this is in the discretion of the State legislature.

VIII. The clause in the bill of rights, respecting taxing property in proportion to its value, does not prohibit this law or any other assessing on counties the salary of a judge. The words are "that all property subject to taxation in this State, shall be taxed in proportion to its value." *All property su'jec' to taxation, &c.* That is, such property as the legislature determine to tax. It leaves a discretion with them; otherwise, it prevents their acting according to the true policy of the State. If they have to tax all the property in the State, or none, then this clause has been totally misunderstood by all the legislatures that have acted under the constitution, for all the property in the State has never been taxed.

It is worthy of consideration, whether the clause of the bill of rights was not inserted to break up the mode of taxation adopted and continued under the Territorial Laws, i. e. taxing, not according to assessed value, but by the price, as horses and cattle at so much a head: 1 Ter Laws, 37, sec. 9, page 229, sec. 11; 1 Ter. Laws 384, sec. 4, p. 386, sec 10; Geyer's Digest page 339, sec 9.

Hamilton and Treat, Judges, vs. St. Louis County Court.

FIELD, for same.

I. Every State law or statute is presumed to be constitutional. Whatever difference of opinion may exist as to the correct rule of interpreting acts of congress, one opinion, only, has ever obtained with regard to statutes of State legislatures. The latter are presumed to be constitutional, and courts will hold them to be so, until they are shown to be clearly in conflict with some prohibition or limitation upon legislative power.

By the theory of our political system, the sovereignty is in the States, and such powers only have been parted with, as were delegated to the Federal Government. The States vested their sovereignty, by their constitutions, in the three departments named. All legislative power is in the General Assembly of Missouri, except, only, in those particulars wherein it is prohibited from acting at all, or only in some prescribed manner. Hence, it is for the respondents here to show clearly, that the act of 1851 is in conflict with the constitution of the State—that it is an attempt to exercise a prohibited power, or it must be held a constitutional act.

II. There is no clause in the constitution, prohibiting the legislature from making a county, most benefitted by a tribunal of justice, or an educational establishment, or a road, contribute most towards the support or expense of the same.

A county is a public corporation, or quasi corporation, created by the legislature, and is no more nor less, than just what the legistaure, in its wisdom, may make it. It may have new powers conferred, and new duties imposed, or those previously in existence taken away. It is a mere creature of the legislature.

If a burden be imposed upon a county, which is unwise, inexpedient or unjust, that is solely a political, or legislative question, and the remedy is at the ballot box. There is no sovereignty in the county, or county court, by virtue of which it can set at naught or nullify the law of the State. The error of the respondents is, in supposing that the county has an existence independent of the legislative will, or rights which are natural, inherent, and beyond legislative control. In this reference is had to the county in its organized form, or as a *quasi* corporation. The argument on the other side, proceeds on the hypothesis that the sovereignty is in the county organizations, instead of the State, and that the State has no powers, save what are granted or conferred upon it by the counties. The reverse is the fact—the sovereignty is in the State, and the counties are what the State, acting through the legislature, chooses to make them.

III. It is not in Missouri alone, but in every State in the Union, that counties are made to pay for State improvements, where the legislatures suppose that the peculiar local advantages render such payment just or proper. Counties in Missouri are required to build court houses and jails for the use of State courts and the incarceration of State prisoners. See Rev. Code of 1845, "county buildings." Also, road duties are imposed upon counties, and the incidental expenses of the State courts whilst in session in the respective counties. The supreme court of this State, held in the case of the county of Boone vs. Tood, 3 Mo. Rep., and in the case of the county of St. Louis vs. Ruland, 5 Mo. Rep., that, not only was it the duty of the county courts to pay for office rent of the circuit clerks, and for the fuel used in their offices, but also, that if they did not pay, a mandamus should be resorted to, and payment compelled. .

Thus has the principle been sanctioned, that the legislature may impose on the counties, a portion of the expenses of State courts. It matters not, whether, as the counsel contend on the other side, you consider this a special tax upon the county, or an appropriation by the legislature, made out of the county treasury, for State purposes. The power has not only been exercised from the origin of our State government, but the supreme court has enforced obedience to it. The cases cited by Mr. Spalding, show, that the consitutional question has been settled in various States. The case from Mass., cited by Mr. Gantt, is not in conflict with this position, or, if so, has been expressly overruled, or an opposite doctrine upheld by

Hamilton and Treat, Judges, vs. St. Louis County Court.

the supreme court of Missouri. In the case of the city of St. Louis vs. Allen, 13 Mo. Rep., the same point was urged upon the court, very elaborately, and judge Napton answers the argument at great length; showing that the legislature not only has the power, with regard to municipal corporations, but also over county organizations. The same point was raised in the case of the city of St. Louis vs. Russell, 9 Mo. Rep., and the doctrine we contend for expressly ruled. The two cases from Teyer's reports, cited by Mr. Gantt, have nothing to do with this question. In those cases, the vested rights of private corporations had been assailed, and judge Catron advanced no new doctrine on that subject. If the act of 1851 takes private property for public use, within the perview of the constitutional prohibition, it must be held that the exclusive right to tax the people of this country, is vested in the county court, so as to become a vested right, which the State would impair by attempting to impose upon the people of the county, any new tax for State purposes. In what sense is the private property of the county, as a corporation, taken by the legislature? Is the money raised, or to be raised in the county for State purposes, by the agency of county officers, county property over which the State has no control? The State does not appoint the county assessor, nor the county collector, yet duties are imposed upon them by statute, and when they collect state or county revenue, they obey the State laws, and the various county officers act from first to last under the authority of statutes. Shall they, any or all, set up some undefined "higher law?" assert that there is some natural or indefeasible right in them, as agents of the county, or in the county itself, by virtue of which the legisla ure can be set at naught, if it attempt to act upon that county, except as the county wills, although the constitution places no such limitation upon the legislative powers, and recognizes no such right in the county.

IV. Either the written constitution is to determine the limits of the powers of the legislature, and the supreme law is certain and fixed, or written constitutions are a farce, and a "higher law," vague, uncertain and visionary, it may be, is to prevail, to the complete disorganization of society.

V. There is no discretion left to the county court, to pay or not to pay. The act of 1851 is mandatory by its express terms, to wit: "The county court is hereby authorised and required to pay, &c." The authority is conferred upon the county court, and that body is required to exercise it. The legislature was thus discharging its constitutional duty, in fixing the salaries of judges by law, instead of leaving them unfixed and uncertain, varying or to vary according to the arbitrary will, caprices or prejudices of three men, who often are, and may be oftener still, litigants before those very judges. Whatever was contemplated to be paid, the county must pay—is required to pay.

VI. The amount is not discretionary with the county court. The design of the act, as expressed in the title, is, "to increase," &c. Here is an increase to be made, and then what is increased is stated, to-wit: "The salaries of the judges." Salary is a fixed annual compensation, and never is used in any other sense. Then section first says, the county court shall pay, &c., "such sum in addition to the amount now allowed to such judge by law," &c. The county court is thus required to add something to those salaries, &c. The amount now allowed by law is $1000, out of the State treasury, and certain fees, not exceeding $1000 more, each year. "In addition" to $1000 salary, and the fees, the county court is required to pay such a sum "as will make the total amount of compensation"—what? An undetermined, fluctuating sum, dependant on the arbitrary will of the county court? To give it such a strange meaning, would be to torture it into conflict with the constitution, which declares that "the compensation shall be fixed by law," not unfixed and left to fluctuate with the changing whims of any three men. The statute must be so construed as to stand, and not to fall, if possible.

Again, the second section declares that the additional compensation herein provided for, shall be paid "quarter yearly." But, by the argument on the other side, there is no "additional compensation herein provided for,"—all is left to the county court, in direct violation of the letter and spirit of the constitution, which attempted to guard against tampering with the judges' salaries, or rendering them dependant upon popular or private caprice. The peo-

### Hamilton and Treat, Judges, vs. St. Louis County Court.

ple of the county elected the judges of the circuit, common pleas and criminal courts; and was it intended that their commission should be practically annulled—the verdict of the people, at the ballot-boxes, set aside, or vetoed, in effect, by the county court? These considerations are proper, to show that the meaning contended for, could not have been the meaning of the legislature.

The evil to be remedied was, an insufficient salary. The law, as it stood before, was to be changed. so as to increase the compensation Before, that compensation was $1000, certain, payable out of the State treasury, quarter yearly, "and also fees, not exceeding one thousand dollars, to be levied," &c. All fees over $1000 annually, were to be paid into the county treasury. How much has been so paid into the county treasury—whether the fees have amounted to $1000 or fallen short, is immaterial for this argument. By the act of 1851, they could, to the extent of $1000, go to the judge, and all over that was given to the county; even if it amounted to one or two thousand more. The legislature then looked to the law as it stood, and refer to it in this act. Following the language of the act of 1845, in part, they provide for a fixed compensation of $3000—$1000 to come out of the State treasury—as much of the other $2000 as should be collected from fees, to come from the litigants, and the residue from the county treasury; but at the same time, the precaution is taken to leave the act of 1845, with regard to fees, unrepealed. so that that the excess, if any, shall go into the county treasury. Hence the use of the words "not to exceed $3000." The law of 1845 is, "and also fees, not exceeding $1000;" of 1851, "not to exceed $3000." The act of '45, section 19, says, the clerk of the court shall keep an account of each year, and the excess over $1000 from fees, "the annual amount allowed said judge out of the same," shall go into the county treasury. As that act is unrepealed, if the fees should, hereafter, amount to over $2000. all over that sum would, by the act of 1851, have to go into the county treasury; and until it equals that sum, the county court must make up the deficit. The act of 1851, then, means, simply, that the county court shall pay to said judges, respectively, such a sum in addition to what each receives under previous laws, as will make his total compensation $3000, but such sum shall not be exceeded. If his fees shall, of themselves, go over that sum, he shall not have the excess, but the same shall go into the county treasury, as the excess has heretofore gone

No other interpretation can be given to the act consistently with the constitution, and so as to give force and meaning, or sense to the language used. The words "not to exceed," if transposed, would give the exact meaning, without room for doubt, so as to read "as will make the total amount $3000," not to exceed that sum. It is obvious, however, that the draftman had before him the phraseology of the act of 1845, the 18th section of which is clearly defined by the 19th. All of these acts are to be construed together, "ex-necessilate," to ascertain the meaning of the act of 1851, and so construing them, there can be no doubt, that our interpretation is the only one consistent with any recognized rule for the construction of statutes.

### Bates, for the county court.

For the respondents, I insist that the reasons assigned by the county court, each and all of them, are good and sufficient in law; and that the said judges have no lawful claim whatever upon the county treasury.

1. The writ (following the petition) wholly misstates the language and sense of the act of 1851.

The writ states that the act authorizes and requires the county court to pay to the judges, out of the county treasury, a sum sufficient to make his annual salary, not less than $3000.

But the act is very different—it authorizes and requires the county court to pay to the judges "such sum; in addition to the amount now allowed to such judge by law, as will make the total amount of compensation received by said judge, not to exceed the sum of $3000.

Hamilton and Treat, Judges, vs. St. Louis County Court.

The bare statement is proof enough. Of course the General Assembly knew that each judge received an annual salary of $1000, payable quarterly; and fees, not annual, but contigent, in time and amount, depending on the rendition of judgments.

If the construction of the judges be right, then they must have an annual salary of $3000, and if they are entitled to fees at all, they may have another $1000 from that source.

II. The act (supposing it a binding law,) intended that the salary of the judges should be increased; but it did not determine the amount of increase, but left the amount to be determined by the judgment and discretion of the county court.

Whatever may be said in oral argument, both parties concur, on paper, that the amount of increase is not fixed by the statute, but left to the determination of the county court. The judges in their petitions, say that the act requires the county court to pay them—not a fixed sum, but, such sum as will make their salary, not less than three thousand dollars. According to their understanding of the act, the increased salary may be indefinitely more, but cannot be less than $3000.

The county court says—adopting the language of the act, that the judge must receive such sum in addition—not to his annual salary, but, to the amount now allowed to such judge by law, as will make the total amount of compensation (fees and all) not to exceed $3000.

And so both 'parties agree that the amount of increase is not fixed by the act, but is left to be determined by the county court.

And this is the plain unquestionable reading of the act. There is no room for construction or interpretation, for there is no ambiguity in the language of the act.

This contingent support, and consequent dependence, of the judges is wrong and dangerous. They ought not to be left to depend for their pay, upon the jugdment, still less upon the interests and caprices of other. The constitution, in order ta make them independent has declared that their compensation shall be fixed by law. See amendments, act 1 § 3.

III The act of March 3rd, 1851, under which this claim is made, is void, because it is against the terms of the constitution—against the known and acknowledged principles of our institution, of which the constitution itself is but a part, and subversive of the fundamental rights which constitute the very elements of legal liberty.

The terms of the constitution, violated by this act, are contained in 7th section of the declaration of rights. "No private property ought to be taken or applied to public use, without just compensation."

Surely, the county treasury is private property, as contrasted with the public treasury of the State. The General Assembly, in acting for the public good, legislates alike, over sections and sub-divisions of country, bounded by local lines, and over institutions and associations of individuals, without respect to the locality of the interests involved. Both kinds are created and governed by the laws of the State, with the double motive of advancing both public and private interests.

The acts establishing the county and county treasury are public laws; and so is the act establishing the Bank. The money in the vaults of the Bank and in the treasury of the county are under the same guarantees of law; and the legislature has the same right to take the one fund as the other, and apply it to public uses.

The act then, is against the letter of the constitution. And it is also against the spirit of the constitution, and subversive of those fundamental rights, for the protection of which the constitution was made. See Jefferson's notes on Va. p, 225, § 4, and following. Grimke's Nature and Tendency of free institutions. Tittle, written constitution, p. 123 and following; 9, Cranch R. 43, Territt vs. Taylor; 2 Pet. R. 629, Wilkinson vs. Selard. See especially p. 656 &c.

What is a constitution, and what are its objects? It is easier to tell what it is not, than what it is. It is not the beginning of a community; nor the origin of private rights: it is not the fountain of laws nor the incipient state of government: It is not the cause, but consequence of personal and political freedom. It grants no rights to the people; but is the creature of their power, the instrument of their convenience, designed for their protection in

the enjoyment of the rights and powers which they possessed, before the constitution was made.

It is but the form and frame work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits and modes of thoughts. There is nothing primitive in it; It is all derived from a known source. It pre supposes an organized socie-ty; Laws; order; property; personal freedom; a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tryranny.

A written constitution is in every instance, a limitation upon the powers of government, in the hands of agents. For there never was a written Republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition.

Our constitution in express terms, acknowledges and continues in force all former rights, laws, officers and functions of office.

In the body of the instrument, the method of changing them is pointed out, as is the method of changing the constitution itself.

The counsel on the other side (Mr. Spalding) has laid down two principles, and two only, from which he deduces the power of the legislature to pass the act in question, viz:

1. The constitution delegates to the General Assembly *all legislative power;* and that in virtue of this grant, the General Assembly can do any thing, possible to be done by legislation, which is not expressly forbidden by the constitution.

And he infers, and attempts to prove, by reading some Pennsylvania book, that the *legislature* can take private property and apply it to *private use,* because they are only forbidden *to apply it to public use:*

I leave this proposition to defeat itself, by its own enormity. Remarking only that the same unlimited powers are granted to the other two branches of the government—the executive and the judiciary.

2. That the county treasury belongs to the State, and is part of the State treasury; and so the legislatures has full power over it.

No reason is assigned for this proposition, except this, that the county treasury is established by State laws, and the funds deposited in it, either created or refused to be by the same laws. But the same may be said with equal force of all corporate Towns, of Townships, School Colleges, the Bank and all incorporated companies.

A county is not merely a municipal sub-division of the State or compartment of the civil and political Government. It is a legal person, capable of making contracts, and of suing and being sued on them. It can receive and hold, buy and sell property real and personal. See R. C. Ch. 37 § 18, county buildings; Ibid Ch 38, conveyances, contracts &c; Ibid. Ch. 41, county treasury; Ibid Art. 3, money from sale of 16 §; Art. 4, Fines &c.; Ch, 45, county court § 15. Has full power to control the county property—real or personal, and apply the proceeds.

So, the road and canal fund goes into the county treasury, by special law—R. C. Ch. 150. § 10 of this act directs the county court to apply this fund to Roads, Bridges or Canals, and *no other object.* And § 11, makes the judges individually liable for any misapplication.

And yet the act of March 3d 1851 requires payment to be made to these judges "out of the county treasury," that is, out of any, and *all* funds in the county treasury—for no distinction is made in the act, in the Judges' petitions, or in the alternative mandamus.

And yet, it is plain there are funds in the county treasury, held in trust, for special objects. Of that character are the township school funds, and the road and canal fund.

The revenues of the county, for ordinary purposes, established on a different footing, and is raised by taxation, expressly and exclusively for county purposes. R. C. Title Revenue Ch. 147 Art. 4. The county court is to estimate what money it will need, for county expenses, and levy the same by a tax. But they cannot tax the people at discretion: The amount is limited, beyond which they cannot go, even to meet such peremptory demands as those now exhibited.

Hamilton and Treat, Judges, vs. St. Louis County Court.

If the legislature determines to evade its duty of paying to the State officers the amount of compensation ascertained to be just and proper. If determined to shuffle off their public duty, and cast the burden upon the county, the city or township of St. Louis (and they have just as good a right to cast it upon the one as the other) they ought, in common justice, to have armed the oppressed section with power to raise, by new taxation a revenue equal to the new burden.

But they have not done so. And of necessity, if these arbitrary impositions are to be enforced, it follows that the county treasury may be exhausted even of its trust funds, and be driven to artificial bankruptcy, for the debts of the State.

They are the debts of the State. The State admits it, by assigning salaries to the Judges, out of the public treasury. And Mr. Spalding admits it, by saying that the county treasury belongs to the State, and therefore the State can take it to pay its Judges.

The State is as much bound to administer, as to make the law—as much bound to pay its constitutional judiciaries as its legislative and executive officers; and has no more right to impose upon sections and loca'ions, a part of the burden than the whole of it.

It has been surmised that there may be a difference between the circuit and common pleas Judges in this regard. I think there is none. The Com. Ples. is part and parcel of the circuit court: The same jurisdiction, carried out and separated only for judicial convenience, because there was too much business for one man to transact.

Again, it has been said by counsel, that the court business in St. Louis is only a local convenience and accommodation. But the counsel did not tell the court why it was local in St. Louis, where there is a great deal to be done and not local in Dunklin and Taney where there is very little. Must all principles be perverted to accomplish this oppression? Shall we say that the State is bound to administer public justice when the lash is light and easy, but has power to cast the burden upon other shoulders as soon as it is found to be inconveniently heavy?

## GANTT, for the same,

Submits, that the act of the Mo. legislature referred to in the application of Judge Hamilton, is unconstitutional and void for the following reasons, viz:

1st. It violates that provision of the Bill of Rights of the people of Missouri, which declares, that all property made taxable by law shall be taxed in proportion to its value: Section 19.

2d. It violates that provision of the same instrument, which forbids the taking of private property for public use, without making compensation therefor, to the owner: Section 7.

FIRST.—In support of the first position, it is submitted, that this provision of the Bill of Rights, first quoted, if it means anything, means that property, taxable by law, shall bear the same burden of taxes for State purposes, whether it be situated in Newton or in Clark county; in Adair, Boone or Mississippi county. Unless this be the meaning of the provision, there is nothing to hinder the legislature from collecting the whole State revenue from one county and exempting the other counties of the State from all taxation for State purposes.

It is not intended at this time; or for the purposes of this argument, to deny the power of the legislature to exempt from taxation, all property of a particular description. It may be that the General Assembly has power to make a general law; exonerating property, coming within a certain description, from all taxation. But it is intended to deny the power of the legislature, to levy, for State purposes, on property, in one county, fifty cents on one hundred dollars of value, for example, and on property in another county, five cents, only, on one hundred dollars of value. In general terms, while it is admitted, that certain property may be exempted from all taxation, it is denied that the legislature can tax that which is taxable by law according to its local position in the State: and it is insisted that it can only be taxed "in proportion to its value," no matter where situated.

Hamilton and Treat, Judges, vs. St. Louis County Court.

This being promised, the court will take notice of the fact that there is already collected from the property in St. Louis county for that purpose, the maximum tax collectable under the general law, independant of and besides whatever sum may be collected to meet the requirements of the act of Assembly, which is under discussion. If, therefore, that act seeks to collect this further sum for State purposes, it is in contravention of the bill of rights.

It is contended, that the purposes to which that act referred are strictly State purposes.

The 7th sec. of the Bill of Rrights declares "that courts of justice ought to be open to every person, and a certain remedy offered for every injury to person, property, or character: and that right and justice ought to be administered without sale, denial or delay." It is the function of one of the three co-ordinate departments of the government, to administer justice between man and man. The legislative and executive departments have their separate duties: and the judicial power of the State is committed to and exercised by the courts of justice prescribed by the constitution and established by law.

In order that a populous and commercial community should have the same speedy and effectual redress by resort to courts of justice, that a sparsely inhabited district of country enjoys the means of the judicial settlement of disputes must be increased in proportion to the increased want of them. The legislature would fail to do its duty, if an equal number of counties in Missouri, without regard to population, wealth or business were assigned to each judicial circuit, and provisions were made for the session of the circuit court for an equal number of days in each county.

In fact, the legislature of Missouri has never acted as if this were a plausible fulfilment of her duties on this subject. But a larger number of the smaller counties composes one circuit, a less number of the more populous counties composes another, and St. Louis, prior to the years 1838, 1849, was erected into a single circuit.

It would be a waste of time to dwell upon the propriety of such legislation. It grew out of the necessity of the case, and is every way reasonable and right. In 1838-9 it was found that one court could not dispatch the business of this county. It was imperative, then, either to divide the county into two circuits, or to create an inferior court, to transact part of the business then done by the circuit court.

The latter expedient was adopted, and the St. Louis Criminal court was established.

In 1841 it became apparent that the civil business of the county was more than one court could dispatch: this led to the establishment of the court of common pleas.

These courts, if not necessasy for the dispatch of business in St. Louis county, should not have been established. If they were necessary, the State was as much bound to furnish them as to give to the smallest county in the State a session of a circuit court twice a year, for one week, each term. It is not a matter of grace and favor, but simple justice.

The salaries of the judges of these courts, are as much a charge on the State treasury as the salaries of the different executive officers of the State or the judges of the other circuits. If it be argued that it is but fair that St. Louis should pay the salaries of those judges who sit in St. Louis county only, the answer is, that St. Louis pays her full share of the salaries, as well of the judges who sit exclusively in St. Louis county, as of those judges who do not sit in St. Louis county at all.

It is not perceived what protection (except the mercy of the legislature,) St. Louis county has against being compelled to pay the expenses of the whole State government, in all its branches, if the present act can be defended. It is not a question of the abuse of power, but of its existence, that we are discussing. Certainly it would be a more grievous injustice than that of which we now complain, if St. Louis should thus be forced to take upon herself all the burdens of the State: but the principle is the same in each case. If the less injustice can be constitutionally practiced upon us, so may the greater; and if either of them be consistent with our constitution, we live under a frightful despotism. But as neither can be practiced without a discrimination against St. Louis county, in the levying of taxes on property there situate, it is submitted, that the 19th sec. of the Bill of Rrights, which forbids such discrimination, is a provision of the organic law, intended to guard against the very abuse of which we have been speaking; and if so, the act of Assembly, entitled "an act to increase the salaries of judges in St. Louis county," is opposed to the constitution and void.

II. The second point I have made, is that the act in question is void, because it seeks to take private property for public use, without any provision or intention to provide for making compensation therefor.

The act certainly disposes of money in the county treasury. If against the consent of the appointed guardians of that fund, any court, acting under that law, can virtually draw a warrant on the county treasury, and complete its payment, money belonging to the corporation of St. Louis county will have been diverted and taken for the use of the State of Missouri. I maintain, on this subject, the following propositions, viz:

1st. That the several counties of the State are corporations, existing by virtue of law, and are entitled to all the rights and privileges of corporations.

2nd. That among these rights is the power of holding, acquiring and disposing of property.

3rd. That property thus held by any county, is private property, which the State cannot seize without being guilty of spoliation.

That the counties are corporations, will appear when we consider that they are bodies politic, having a legal existence by authority of law, a corporate name and a place, and all the incidents of a corporation, namely, a common seal, a power of being sued and of suing, and of acquiring and transfering property by their corporate name.

That the name, existence and place of each county is established by law, need not be dwelt upon. That their powers of suing and being sued, of holding and transferring property by that name, and of authenticating their acts by their common seal, are also fixed by law: Rev. Code, 1845, Ch. 38, page 289. See also, sec. 25, art. 1st of an act respecting corporations, for a legislative recognition of the corporate existence of counties.

III. On the third point, it is hoped that little argument is needed. It is one of those things that cannot be made clearer by argument than by a simple statement. Ex vi termini, the property of St. Louis county is peculiarly belonging to the county of St. Louis, and no natural or civil person can interfere with it, without an invasion of the rights of property vested in the county of St. Louis. With respect to the State, such property is as sacred as the property of any other corporation or individuals; as inviolable, e. g., as the property of the city of St. Louis, of the bank of the State of Missouri, or any opulent citizen of the State.

Therefore, unless it can be maintained, that a power exists, whereby the State may appropriate money out of the treasury of the city of St. Louis; or out of the bank of the State of Missouri; or out of the revenue or capital of one or more of the richest men in the State (who are natural persons) or out of the property of any corporation (which is a civil person;) and this, too, ad libitum, for there is no such thing as affixing limits to the exercise of the power: unless all this can be maintained, the act in qustion is a nullity.

Compensation is, from the very nature of the case, out of the question, none is intended to be made, and the act does not hint at any thing of the kind. To which, it may be added, that there is no example of taking money, by right of eminent domain, and making compensation therefor. It some times happens that the property of an individual is essential for the public service, and the latter must suffer unless the former be taken. In all these cases, the State must pay or offer to pay the value of the property taken to the sufferer. Its value is so much money as fairly represents it in market. But it would be folly to talk of the money of A. being essential to the public good, to that the violation of A.'s rights of property in it would be a less evil than the State's being deprived of the money. The State being always bound to return an equivalent in money to A. We read of "forced laws" in other lands, and pity the people where such practices obtain; but if laws like this can be upheld, we ourselves, if we submit to such a system one moment longer than the application of the peaceful, constitutional remedy requires, will be the fittest subject for pity. It is contended, that the "compensation," included by the Bill of Rights, is something very different from the benefit which St. Louis may be supposed to desire, in particular from the service of the judges, who are the beneficiaries of the act we are examining. Not to mention that the courts, over which these judges preside, are open to the people of the whole State, and of other States as well as to the people of St. Louis county; and that it might as reasonably be contended, because St. Louis being the richest and most populous county in the

2

Hamilton and Treat, Judges, vs. St. Louis County Court.

State, has more interest in and benefit from the supreme court than any other county, and therefore, should pay all the salaries of the judges. Besides all this, St. Louis, already, by paying into the State treasury taxes which go to the support of every judge in the State, has contributed in full proportion to all benefit received towards the expenses of the judiciary throughout the State, including St. Louis county; and there is surely no equity in calling on her to pay twice. To require her to do more than she has done already, is to confiscate, not to tax; and is subversive, no less of the constitution of the State than of every principle of common right: 1 Yerger 452, 456, 458; 2 Yerger 554, 599, 623; Ibid. 260, 271; 16 Mass. 76.

Mr. Spalding contends, that the legislative power being granted by the constitution, to the General Assembly, that body possess the power, with no limitations, except such as are found in the constitution itself, which may, for the purposes of my argument, be conceded, inasmuch as the whole scope of it has been to show that the law under examination, is opposed to the express provisions of the constitution. But, in order to show that the act is consistent with the constitution, it is not sufficient to show that it is not more inconsistent with it than certain other acts. Nor is it any objection to our argument against the act, that if it be declared a nullity, certain other statutory provisions must share the same fate. *

But the acts which he cites, as being in this relation to the act we are examining, do not bear out his assertion. They are general laws, which require counties to erect courthouses and provide fuel and stationery for the courts that sit in them. I am not at all prepared to say that it would not be entirely competent for the legislature to provide. The difference is between a general law and a law of partial, and therefore unequal operation—(2 Yerger 260, 554,) by a general law, that each judicial circuit should pay the expenses of the courts sitting in it, or that each county of the circuit should contribute towards their expenses in the ratio of its business. But every one can see that this is widely different from making a circuit first contribute to the expenses of the judiciary, in every other part of the State, and then, in addition to this, forcing it to pay all the expenses of their own judges. The moment this is attempted, the property in that circuit is made to bear a double burden of taxation, and the provision of the bill of rights is violated—section 19.

Mr. Spalding admits that the counties are corporations; but he says the State made and can unmake them, and take away their powers at pleasure, and upon their dissolution all their property belongs to the State.

That the State may repeal some charters of incorporation, is true; and the power of repeal is, in many cases, expressly reserved to the State. But that upon such repeal, the property of the corporation escheats to the State, is a monstrous doctrine, such is not our law. See sec. 24 of an act concerning corporations, Rev. Code, '45, p. 236. The property of a corporation belongs. first, to its creditors, and secondly to its stockholders, or rather, it belongs to the stockholders, subject to the debts it owes. Its dissolution makes no difference as to the rights of property. Every one is shocked at being told that the legislature can seize upon property, in the way suggested, without being guilty of what, in an individual would be called robbery. Should a State stoop to it, it will bear, perhaps, the milder name of spoliation.

The present enquiry is not, as Mr. Spalding says, whether the act in question is an onomaly in our legislation or of a piece with former acts of the General Assembly; nor is it perceived what connection there is between it and the law paying the judges of this county by fees levied on the litigants in the circuit court and court of common pleas; which last mentioned act, Mr. S. says has been in force ever since 1841. This is not quite accurate, so far as the circuit court is concerned. Judge Mullanphy refused to allow these fees to be collected in his court; but the law has been enforced I believe, since his resignation. But if the laws are alike, which is not admitted, nothing is gained for the relators. Few persons will be found, willing to test the constitutionality of a law, involving only one dollar of expense to them. Few can afford either time or money necessary for such an act.

Mr. S. then proceeded to quote certain decisions of courts of other States. Of these I s bmit, that the following, viz: 24 Wend. 65, 68; 9 Greenl. 5; 3 Dall. 400; 20 Wend. 381;

Hamilton and Treat, Judges, vs. St. Louis County Court.

2 Scam 95; 3 Scam 130, are all merely declaratory of what no one thinks of denying, viz : that the legislative power, which is conceded to be in the General Assembly of those States, must be exercised according to the discretion and good sense of the legislature, I say. I do not deny this at all. I only deny that the legislative power of the General Assembly of Missouri extends to such acts as this we are discussing.

The case in 3 Denis 381, merits more examination, because, on its face it seems to have established the constitutionality of a law somewhat like our own. But on examining the case, it will appear that the only questions before Judge Cowan, and decided by him, were—1st, whether the declaration was good under the N. York law; 2nd, whether the act giving Judge Lynch his salary should have been passed by a majority of two-thirds or by a simple majority. These were the only questions decided by Judge Cowan. His decision was affirmed on an appeal to the Senate of New York, by a vote of 10 senators against 9.

Now it is impossible to say that this decision makes much in favor of the relators. for it does not touch the matter in dispute. But it must be obvious, that there is a very small prospect of peacefully impeaching the power of the legislature to do an act, when one branch of that legislature constitutes the court of last resort to try the question of their power. There is a somewhat vulgar proverb, strongly indicative of the prevailing opinion of the hopelessness of such appeals.

In 4 Mart. 138, the court expressly says that there is in the constitution of La., no limitation on the exercise of the taxing power. Of course such a fact destroys the value of that case as an authority in States where such limitations exist.

13 Pick. 60—the court in this case, sought to distribute a burden instead of confining its weight to a few. The case is not applicable. Even in giving the opinion in that case, the court cites with approbation the 16 Mass. 76, which pointedly condemns as unconstitutional such legislation as this of Missouri. 1 Jones' Rep. 70 (11 Penn. Rep.) This case strongly lays down the powers of the legislature of Penn. on the subject of taxation, but we know nothing of the restrictions on the legislative prescribed by the constitution of Pennsylvania. Even were that constitution a copy of our own, however, this case does not go to the length of establishing the legality of the Missouri act. The three cases to be found in 1 Breese 120; 1 Humph. 48, and 8 Mo. Rep. 239, are beside the subject, and it is not perceived why they were cited, except that in a mode peculiar to themselves, they seem to give countenance to the doctrine of a power existing in the legislature to disturb vested rights. It may be admitted, that they all assert very questionable law; but that is the only reason perceived why they are favorites with the relators' counsel.

Mr. S. says, that to show that the legislature may abuse the power he claims for it, is no answer to his assertion of its existence. Certainly not—all power is liable to abuse, however guarded. But certain particular abuses can be provided against, and forbidden, and that we say has been done by our bill of rights, with respect to the present act. We say, moreover, that supposing the question of this being an attempt to exercise a forbidden power to be doubtful, it is no weak argument against it, to demonstrate that nothing can be said in its favor which cannot equally be said in support of what every one must admit to be despotism in its most unequivocal shape.

Mr. S. says that St. Louis receives, in the services of these judges, an equivalent for the salaries taken from her treasury. The answer to this is, that it is the duty of the State to estimate the State expenditures, and levy a tax to meet them, observing the rule imposed by the constitution, to tax property in proportion to its value. Should it come to pass, in the expenditure of the State revenue, that St. Louis receives from it a benefit more than proportionate to the sum she contributes towards it, the only way to remedy this injustice to the rest of the State is, to devise some rule of taxation which will make St. Louis pay her full share of the public burdens; but this remedy must be given by a change in the organic law. As that law now stands, St. Louis can only be called on to pay into the State treasury a certain proportion of the whole State revenue. To require her to do more, because, in the

opinion of this or that individual, or this or that legislature, she does not|pay enough as matters stand as to commit a bare-faced violation .of the constitution.

We do not say but that it is right and proper to provide by law for an increased salary to the judges, named in the act. We only say that it is not permitted to the legislature to rob Peter to pay Paul—to confiscate private property in defiance of the constitution, in order to pay a debt which the State rightfully owes.

GAMBLE, J., delivered the opinion of the court.

In these cases the relators, judges of the circuit and common pleas courts, of the county of St. Louis, having presented their accounts to the county court of said county, for the additional compensation provided for in the act of the 3d of March last, and the county having refused to allow the accounts, have obtained writs of conditional mandamus to that court. The county court return to those writs, as the reason for their refusal to allow the accounts of the said judges and order the same to be paid out of the county treasury.

1. That the act leaves the amount of additional compensation, to be paid to the judges, to the discretion of the county court, and the county court have not determined, in the exercise of that discretion, what amount, if any, shall be paid to them.

2. "That the act, so far as it requires money to be paid to the said judges, out of the county treasury, is unjust, oppressive and void; is repugnant to our system of government and unconstitutional, and, therefore, the payment of any money out of the county treasury to the said judges, under the said act, would be a misapplication of the county treasure, entrusted, by law, to the administration of the court."

An application is now made for a writ of peremptory mandamus, on the ground that the cause shown by the county court is not sufficient to warrant the refusal to allow the accounts.

As the first reason assigned by the county court depends on the proper construction of the act of the 3d March 1851, it is proper to set it out. It is in these words:

"An act to increase the salaries of Judges in St. Louis county.

*Be it enacted by the General Assembly of the State of Missouri:*

"§ 1. That the county court of St. Louis county, is hereby authorized and required, to pay out of the county treasury of St. Louis county, to the judge of the St. Louis circuit court, the judge of the St. Louis court of common pleas and the judge of the St. Louis criminal court, each, such sum in addition to the amount now allowed to such judge by law, as will make the total amount of compensation received by said judge, not to exceed the sum of three thousand dollars.

Hamilton and Treat, Judges, vs. St. Louis County Court,

"§ 2. The additional compensation herein provided for, shall be paid at the same stated periods, as the salary of said judges respectively are now paid by law.

"§ 3. This act to take effect from and after the first day of August next.

Approved March 3, 1851."

In order to the correct understanding of the phraseology of the act, it is necessary to state the provisions of previous laws, allowing the judges compensation. They have always received the same salary, from the State treasury, that has been allowed by law to the judges of the circuit courts throughout the State, to-wit: one thousand dollars. In addition to this salary there were fees allowed each of the judges, of fifty cents for each judgment in a case, coming, by appeal, from a justice of the peace, and one dollar for a final judgment in all other cases; but the fees received were never to exceed one thousand dollars per annum, and any excess of fees over that sum, was to be paid into the county treasury.

The act of the 3d of March is passed with the knowledge of the different sources from which the compensation of those judges had been previously derived, and its design is to increase that compensation. The additional compensation is to be paid, as the second section declares, at the same stated periods at which their salaries are, by law, to be paid. As the part of their compensation by fees, is still retained, and as the amount so to be received, is an unascertained and varying amount, it is impossible to fix the amount of the additional compensation designed to be given by this act. There are three different portions of the compensation to be received; the salary from the State, the fees from suitors, and the money to be paid by the county, and the whole compensation is not to exceed $3000. The former maximum was $2000, of which $1000 was the salary, and the balance fees, not to exceed $1000. Now the maximum is raised to $3000. The county court regard the use of the words "not to exceed," as designed to restrain them from making too large an allowance to the judges, and leaving it to their discretion to make the additional compensation as small as they think proper.

We do not think this a fair or reasonable interpretation of the act. In its whole scope it shows a plain intention to give a substantial and certain increase to the compensation of these officers. It so speaks in the title; its enactment is in the language of command, while the construction put upon the language reduces it to a bare permission to the county court, to pay such sum as they think proper. We suppose the

words "not to exceed the sum of three thousand dollars," were employed to meet such a case as this.   The county court having an account before it for $500, for one quarter, and evidence that no fees have been received, is required, by the law, to cause it to be paid, and so for another quarter, with the same evidence; but, if at the third quar-ter the fees received amount to the whole $500, they are not required to pay any additional sum; or, if the fees exceed the $500, they are authorized to carry the excess into the next quarter, and pay only the bal-ance of such quarter, so as that the whole compensation received shall not exceed three thousand dollars.   The act is awkwardly phrased, but we think the intention of the legislature is sufficiently plain, and that that intention does not vest the county court with the discretion they claim.

The second cause assigned by the county court is, that the act is un-constitutional.   We say this is the sum of the language in the return, for in the consideration of the case, we have found no power vested in this or any other court to remedy injustice and oppression in a legis-lative act, except where, in the attempted injustice or oppression, some constitutional provision is violated.

The argument in support of this part of the return, places the uncon-stitutionality of the act upon its alleged repugnance to the 19th section of the 13th article of the constitution, which declares, that "all prop-erty subject to taxation in this State, shall be taxed in proportion to its value," and to the 7th section of the same article, which declares, "that no private property ought to be taken for public use without just compensation."

In considering the question thus presented, the suggestions made at the bar, that this act was passed upon the petition and urgent solicitude of many of the citizens of the county, and received the unanimous sup-port of the representatives of the county, can have no weight, for the reason, that the General Assembly can derive no power from a petition, and the constitutionality of the act is in no degree effected by the fact that any given portion of the Assembly supported or opposed it.

We have been asked, in examining the question now before us, to consider the constitution as an instrument adopted by a community, previously organized, already familiar with the principles of free gov-ernment, and not a mere aggregation of individuals who were before in a state of nature, without political or civil institutions.   We are asked to regard the constitution in this light, in order to find a rule of inter-pretation that shall limit the grant of legislative power to the General Assembly, beyond the extent of the limitations contained in that part of

the constitution, familiarly termed the "Bill of Rights." It is expressly disclaimed in argument, that there is any law higher than the constitution, and this resort to the history of the community, is simply to find a rule for the interpretation of the instrument.

If there be in the constitution any language of doubtful import, we must, of course, look to the circumstances and condition of the people, and to the history of the instrument itself, to find the meaning of the clause in question; but where the language is plain and intelligible, and consistent with all other parts of the instrument, we cannot allow ourselves to find, in any reference to facts, out of the instrument, any authority for interpolating either a grant of power or a restriction upon power granted.

Nor is there any necessity for such reference, in order to reduce the general grants of power within limits in which they may be exercised with safety to the community and individuals. The declaration of rights which furnishes limitations upon the powers to be exercised by all departments of the government, is a comprehensive declaration of the great principles upon which rest our political, civil and religious freedom, and our social and individual security. The invasion of these principles, by any functionary of any department of the government, is as much a violation of the constitution as if they were written out in the form of the most imperative prohibition. Yet, where all this is stated, it still remains true, that no court is authorized to declare an act of the legislature void without being able to point out some specific clause of the constitution to which it is repugnant.

Within the limits thus allowed for the action of the different departments of the government, much injustice may be practiced and much wrong done, for which there is no remedy. The highest and purest court that ever sat on the earth, may render a judgment erroneous in its principles and ruinous in its consequences, and yet there is no remedy. The chief executive magistrate may appoint to an office of high trust, a man entirely unworthy to fill it, and there is no remedy. The legislature may from mistaken views of policy, pass a law greatly injurious to the best interests of the State, or a law, oppressive in its operation on one class of citizens, and yet there may be no remedy provided by the constitution, while the law continues on the statute book. The power, to be sufficient for good, must, of necessity, be capable of producing much evil, even when exercised within the acknowledged scope of the grant. It may therefore be stated, as a principle, in construing the constitution, that the mere fact, that a law is unjust in its operation, or even in the principles upon which it was adopted, does

not authorize any expansion of the prohibitions in the constitution, beyond their natural and original meaning, in order to remedy the evil in the particular case.

When we turn now to the consideration of the act in question, its injustice is apparent, upon its own face. The citizens of a county who have been required to pay their proportion of all the expenses of administering the law throughout the whole State, are required, in addition, to pay the largest part of the expense of administering the same law in their own county. The wrong done to the county is palpable, but with this admitted, the constitutionality still remains untouched.

When the 19th section of the declaration of rights is invoked, to protect the county against this act, it is necessary to enquire into the meaning of the declaration "that all property, subject to taxation in this State, shall be taxed in proportion to its value." The clause is evidently mandatory upon the General Assembly, when exercising the taxing power, and furnishes a rule which is not to be departed from. What property shall be subjected to taxation is left to their discretion, but when they have selected the subjects, the rule for assessing the tax, is, in proportion to the value of the property. It is not necessary in this case to decide, whether a different rate of taxation can be imposed upon different descriptions of property, all being taxed by an ad valorem tax. The idea of equality in taxation, is certainly not the prominent idea conveyed by this clause; nor can we suppose that it was designed to be conveyed, when we consider that so many constitutions of other States previously adopted, contain clauses expressly enjoining equality in taxation, and when the insertion of a word or two in the clause would have expressed the idea clearly. It may be further observed, that if equality in taxation is required by this section, then the provision in the first section of the tenth article, that the lands of non-residents shall never be taxed higher than the lands of our citizens, is entirely superfluous.

We might dismiss this point without further consideration, for the return of the county court does not state, that in order to pay the judges the additional compensation demanded, there will be any necessity for increased taxation upon the citizens of the county. The county treasury receives money from fines, forfeited recognizances and other sources besides taxes, and we cannot judicially know, that the other funds in the treasury are not sufficient to meet this expenditure without taxation. But it is not the wish of the court to avoid deciding the case upon principles that will settle the controversy; and it will therefore be assumed, that in order to meet this additional demand upon the county treasury,

it will be necessary to increase the county tax. Does this fact establish a repugnancy between the act and the constitution? Does it disturb the rule that requires property to be taxed in proportion to its value? Each county court is authorized by law, after the assessment of the property in the county is made, and the tax books are corrected and adjusted according to law, to ascertain the sum necessary to be raised for defraying the expenses of the county and to levy such sum by a tax upon all property and licenses made taxable by law for State purposes, so that the county tax shall not exceed the State tax on the same subject, more than one hundred per cent. This provision of the statute obviously contemplates a different rate of taxation in different counties, for defraying county expenses; and if the constitution requires that every citizen of the State shall, upon all his property, be taxed for county and State purposes, at precisely the same rate then this power, as it has always been exercised, has been repugnant to the constitution. In different counties, the rate of taxation for county purposes, has always differed very materially, as the expenses of county buildings, roads, bridges, expenses in criminal prosecutions and other county expenses have varied. We learn, that in the populous and wealthy county of Howard, where all the county buildings, and other improvements are completed and paid for, there is sometimes no county tax levied. In some of the other counties, the maximum allowed to be levied by the law is imposed, upon the supposition that the constitution imperatively requires equality, either the citizens of Howard must be taxed at the highest rate allowed by law, although they would have no use for the money in the county treasury, or there should be no county tax imposed in other counties whenever one county, such as Howard has no county tax levied. If the constitution requires equality in State and county taxation, then, instead of leaving the subject to the discretion or judgment of county courts, the General Assembly must fix one uniform rate of county taxation without regard to the different wants of the different counties. It is not believed that the constitution admits of an interpretation that would produce such results. It is not doubted, that the rule of taxation, adopted for State and county taxation is the rule required by the constitution. The property is assessed at its value, and upon that value the same rate of taxation is laid throughout the State, for State purposes, and the several county courts, taking the same valuation, levy such per cent. for tax as the expenses of the county require.

But, it is said, the General Assembly cannot pass an act by which a burden, that ought to be borne by the State treasury, shall be cast upon

the county treasury, and thus the county taxation be increased. The question we are now considering is, whether an act that increases the county tax in any one county, is repugnant to the constitutional provision that requires all property to be taxed in proportion to its value. The question, whether the General Assembly has the constitutional power to pass an act that will have this effect, does not in any degree depend upon the considerations or motives that produce the passage of the act. The objection to the law is, the effect on county taxation. Now the same effect would be produced by a law which required the county of St. Louis to expend an equal amount of money upon roads, public buildings, the pay of jurors or other matters of county interest, which the General Assembly might judge to be properly a burden upon the county treasury, and such law would, upon the point now in discussion, be as liable to the objection of violating the constitution as the act now under consideration.

All county expenses, for which a tax is to be levied, or of which the county court is authorized to make payment, are either expressly created or are authorized by law. The peculiar position and circumstances of any county may require, in the judgment of the General Assembly, the expenditure of money for the accomplishment of an object of the highest interest to its inhabitants, and exclusively local in its character and benefits, but there may be no law authorizing the expenditure. It is not doubted that the General Assembly have the constitutional power to direct the authorities of the county to cause the work to be done, and payment to be made out of the county treasury. The practice prevails, to some extent, of directing votes of the people to be taken in different localities, upon questions relating to expensive undertaking, that will be burdens upon the people in that locality, and authorizing debts to be contracted or taxes to be imposed, as the popular vote may determine. It is not believed that a tax thus imposed upon the property of a citizen is in any degree more constitutional than if imposed directly by the General Assembly. The General Assembly must be regarded as charged with the duty of promoting, by proper enactments, the interests of the whole and of each portion of the community, and authorized to impose the burdens, arising from local works or services, upon the inhabitants of the locality benefitted. When, in the exercise of their judgment, they determine that the benefit is so exclusively local as to require that the expense shall be borne by the treasury of a county, rather than by the State treasury, the clause of the constitution, requiring property to be taxed in proportion to its value, is not violated. We cannot revise their judgment, in such case, under this clause of the

constitution and declare their acts inoperative. In relation, then, to the act now in question, it is the opinion of the court, that it is not repugnant to the 19th section of the Declaration of Rrights.

We proceed then to the second objection, which is, that the act is repugnant to the clause in the 7th section of the Declaration of Rights, which says, that "private property ought not to be taken for public use, without just compensation."

This is a limitation upon the right of eminent domain, which is inherent in every sovereignty, and under which the rights and interests of each individual citizen must yield to the necessities of the State. Here is the limitation of·the right, not that the rights and interests of the citizens shall be preserved against the demands of the community, but that he shall have compensation for his property that may be taken.

It is exceedingly difficult to comprehend the argument that is designed to show a repugnance between the act in question and this clause of the constitution. It appears to assume that the county treasury is the depository of the voluntary donations of the citizens, made for specific and declared uses, and that this act is an attempt to confiscate the money thus collected, and apply it to the uses of the State. This is altogether an incorrect view of the character of the fund held in the county treasury and of the operation of this act.

The assessors of the county are required by law to return their books of assessments to the county court on or before the 1st. day of June in each year. Revised Code 934 sec. 34. Thirty days after the return of the tax books, a court of appeals is required to be held, to hear appeals from the assessment, and then the tax books are to be corrected and adjusted. After this is all done, the county court ascertains the sum necessary to be raised for county expenses, and levies the county tax: Rev. Code 946 sec. 2. The act now under consideration, was passed on the 3d of March, 1837, and took effect on the 1st day of August thereafter. Now if the county court has taken the expenses required by this act, into their estimation of the sum necessary to be raised for county purposes, then the money demanded by the Judges is actually in the county treasury, for the very purpose of paying their claim. And so in the future operation of the law, if the county court, in ascertaining the amount to be raised, take this additional compensation of the Judges into their estimate, the money to meet the demand will, by the operation of other laws, always be in the treasury to answer the demand. So this act does not propose to seize the funds of the county, paid by the citizens for their own benefit into the county treasury, and appropriate them to a different public use, but authorizes

and requires the payment of money out of the very fund in the treasury to satisfy this demand.

It is the opinion of the court, that the act in question is not repugnant to that clause of the 7th sec. of the declaration of rights which asserts that "private property ought not to be taken for public use without just compensation."

We have examined the two clauses to which this act is supposed to be repugnant. We find no repugnance to either. If, in listening to the voice of the people, speaking through the constitution, we had found one utterance prohibiting the passage of this act, we would cheerfully have rendered that prohibition effectual, but we are not at liberty to give our judgment of expediency, or even of justice, a controlling power over acts of the General Assembly. Our duty, then, alone remains for us to perform, and that is to enforce the law. Let the peremptory mandamus issue.